UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO: 05-10229-WGY |
| | : | |
| JAMES E. DAY | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

James Day appeared before Your Honor on November 2, 2005, and pleaded guilty to a one count Information charging him with Honest Services Mail Fraud in violation of Title 18 U.S.C. § 1341 and 1346.

**Unresolved Guideline Issues**

The Presentence Report has concluded that the Total Offense Level is 15, Criminal History Category I, for a guideline range of 18 to 24 months. Probation arrives at its offense level by using the guideline manual in effect at the time of the instant offense, the November 2003 manual. USSC §2C1.7 provides for a base level 10. Probation then enhanced the base level 10 by eight levels because it believes " the offense involved an elected official or any official holding a high-level decision making or sensitive position." The PSR posits that the defendant's position alone, as an Assistant Chief Probation Officer in Woburn District Court, is sufficient to the meet the definition of a high-level decision making or sensitive position.

While it may superficially appear that the defendant's position title must be high-level, looks and titles are deceiving. Neither the defendant nor the government has any evidence to show that this enhancement is appropriate. While the burden is on the

1

government to make the argument for aggravating factors, in fact the government has weighed in with its position that the enhancement is not applicable in this case. Indeed, the government would be in violation of the plea agreement to argue in favor of the enhancement. But if the government truly believed the enhancement did apply, it could have stood silent on the issue and not be in danger of violating the agreement. Such is not the case. The government has reviewed the issue and concludes that the enhancement does not apply.

Some minor confusion has arisen because if the court finds the enhancement does not apply, as the parties agreed it did not, the parties erroneously agreed to use the 2004 version of the guidelines that is more onerous to the defendant than the manual that was extant at the time of the Commission of the offense, i.e., the November, 2003 version. [1]

While it is true that the definition of the enhancement differs slightly from one manual to the other, in neither case -- the eight-level enhancement found in the November 2003 edition at §2C1.7(b)(1)(B) nor the enhancement found in the 2004 edition at §2C1.1(b)(3) -- is the definition applicable to the defendant. (NOTE: §2C1.7 has been deleted from the 2004 edition.)

We start first with the definition of the term contained in the 2004 version. Application Note 4 to §2C1.1 advises "'*High-level decision-making or sensitive position' means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process.*"

---

[1] 2003 Version – no enhancement – level 10
 2003 Version – w/8-level enhancement –level 18
 2004 Version – no enhancement –level 14
 2004 Version –w/4-level enhancement – level 18.

2

In spite of the defendant's title "Assistant Chief Probation Officer" he had little or no decision-making authority that affected either the lives of probationers or the officers under his supervision. All recommendations made by the defendant would of necessity be reviewed by a higher authority. As this Court well knows, probation officers and their superiors cannot operate independently of the presiding judge's authority. Every major decision affecting a probationer must be approved and sanctioned by the judge who sentenced that person. Supervising probation officers do not even have the authority to set a schedule for payment of a fine imposed by the Court. This lack of authority is even more relevant for the defendant who operated in a small district court in Woburn. The Woburn Court has eight line probation officers, two assistant chiefs and one chief. The court handles misdemeanor cases, many DWIs, revoked drivers' licenses, possession of small of drugs, etc. A Position Summary of the defendant's duties is appended to this memo. Specifically, that summary states:

> The assistant chief probation officer, as supervisor, under the supervision of the chief probation officer and the first assistant chief probation officer, where applicable, has dual responsibilities to help those whom he/she supervises to carry out their jobs with increasing competence and to see that the court work is carried out.

There is nothing in the description that characterizes the position as "law enforcement," "decision-making," or "sensitive." To characterize the defendant's position as "high-level" is an exaggeration. *See U.S. v Stephenson,* 895 F.2d 867, 877-78 (2nd Cir. 1990) ("That [defendant's] duties involved some degree of discretion and required him to possess a security clearances does not set him apart from the multitude of personnel in the federal service,"). Compare the defendant's position with *U.S. v.*

3

*Reneslacis,* 349 F.3d 412 (7th Cir. 2003) (Affirming the enhancement, "Because only a handful of decisions were ever reviewed, he had near total control over who could become a permanent resident and eventually a U.S. citizen. Possessing unreviewed power over important public decisions reflects a sensitive post, even if existing rules dictate how those decisions should be made.") Defendant Day made no decisions or recommendations that were not reviewed by a higher authority.

In the other guideline manual, version 2003, the definition to the enhancement is slightly different:

> *"Official holding a high-level decision-making or sensitive position" includes, for example, prosecuting attorneys, judges, agency administrators, supervisory law enforcement officers, and other governmental officials with similar levels of responsibility."*

The only part of this definition which one might believe applies to the defendant is in one of the examples: "supervisory law enforcement officers."

This example, however, does not fit defendant Day's job description. District Court Probation officers are not "law enforcement officers." They, unlike their Federal counterparts, are not authorized to carry firearms. They, unlike their Federal counterparts, do not participate in a retirement program for "law enforcement officers."

Whether the Court considers the definition for this enhancement under the 2003 or 2004 manual, the defendant and the government submit that it is inapplicable. *See* Government's letter to Probation in response to PSR attached.

Finally, Probation has taken the position in its Addendum to the PSR that the defendant held a "sensitive" position and therefore qualifies for the enhancement. The defendant takes issue with this position as well. The Probation officer makes many assumptions about the defendant's position as "sensitive" that are not supported by any

4

evidence. For instance, district court probation officers cannot issue subpoenas on their own. A district court probation officer must go to the Clerk's office for a subpoena. While the probation officer has authority to ask for a subpoena, he may not issue the subpoena himself. The PSR addendum then compares the district court probation position to that of a juror. This analogy is also inapt. A juror has an important decision-making authority which makes the position sensitive. A juror's decision has a direct impact on a defendant in the court. The Probation officer's decisions cannot affect a probationer without the presiding judge's action. A juror's decision does not depend on the judge's approval. There is little in common between these two positions other than both are for the work of the court.

All things considered, it appears there is insufficient evidence to prove even by a preponderance standard that the defendant held a "high-level decision-making or sensitive position." The fact that he was able to use his position to commit the crime speaks to the value placed in the defendant's word as a probation officer and the integrity placed in it. That use of his position is what amounts to the crime itself.

### Aberrant Behavior

The defendant wishes the Court to consider that the defendant's crime consists of one single act that occurred on September 29th, 2004. Jim Day's crime was totally out of character and contrary to an otherwise spotless record for his 67 years. The policy statement at §5K2.20 Aberrant Behavior is an encouraged departure and one that fits the defendant and his case in every aspect.

> In General, except for an offense involving a minor victim, a downward departure may be warranted in an exceptional case only if the defendant committed a single criminal occurrence or single criminal transaction that (A) was committed without

5

significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life.

The defendant's crime did not involve "significant" planning. Jim Day knew what he had to do to get Sharon Brennan's driver's license back. He created the type of documents that he had done on other occasions. Only in this instance, the documents were falsified to convince the appeals board that Sharon Brennan had attended alcohol treatment and drug treatment and that he was her supervising officer, and then he attested to their veracity. The appearance before the Board of Appeals occurred on one day and comprises the offense for which Mr. Day now stands convicted.

The policy statement at §5K2.20(n.3) suggests a list of factors that the court may consider in determining whether to depart under this guideline: the defendant's mental and emotional conditions; employment record; record of prior good works; and motivation for committing the offense. In this regard, the defendant has many characteristics that suggest he more than qualifies for this departure.

James Day has spent his entire adult life in the service of others. He began a life of giving when he entered St. John's Seminary in Brighton at the age of 19. Although he earned a Bachelor of Art degree at St. John's, he did not stay long enough to be ordained a priest. Instead, he returned to the community and in 1968 he began work at the Woburn district court as a probation officer. Over the years, his good work in the court both with probationers, their families and court personnel earned him a final promotion to Assistant to the Chief Probation officer. Numerous letters from former probationers, families of probationers, lawyers who have worked with Jim, and friends appended to this memo attest to James' honesty, compassion, and involvement with his Probationers. A few examples include:

- Attorney Anita Reinold writes, "I have worked with Mr. Day through the Woburn District Court…I have found him to be a dedicated and caring probation officer…The fact that Mr. Day is facing criminal charges seems totally out-of-character for him and surprising to me."

- Attorney George Sacco writes, "Over the past four decades, I have had the distinct opportunity on several occasions to witness Jim Day's interactions with all types of people of all ages, ethnic, educational and economic backgrounds…Jim Day has been such a special human being who has always reached out to people with a selfless and considerate heart.  He has been a wonderful asset to the Woburn Court and has always stood for fairness, integrity and justice for all."

- Cheryl Riley, wife of a former probationer arrested for DWI writes about the care the defendant provided in helping the husband to get the proper treatment he needed.  "We were truly blessed the day Jim Day came into our lives.  We consider him our Guardian Angel as he restored our hope and faith in becoming a family again.  In today's busy world, such dedication is the exception to the rule.  Jim Day is one of those folks with these qualities and more."

- A former probationer, Carl D'Elia, writes of having known the defendant since he was 13 years old.  Now 50 years old, D'Elia writes, "About the age of 13, I was introduced to Mr. James Day thru the court system.  He was my probation officer for one year.  For that year, Mr. Day watched over me like I was his own son and helped me in a lot of difficult situations.  The relationship between Mr. Day and myself continues to the present day.  I still go to him when I need advice

7

or help and he has never turned me away. How do I thank a person like that. I love Mr. Day as he was my own father. This man has done so much for so many, putting them before himself."

- Of his work in the community, Edward Boback writes, "Jim Day has been a friend to me for over 25 years. We first met when our children on the same swim team, Jim and I coached our daughters' softball team together, and as the years went by we became very good friends. He sponsored me in the Lions Club of Reading, where he donated a lot of his time to help others. As a father he was very involved with Bishop Fenwick High School where his children attended. He coached the ski team and continued to coach and be involved with the children even after his children had graduated…I do know that Jim Day is a Kind, Gentle, Moral, God loving Human Being that deserves a chance to be heard or understood in this matter…"

- The defendant's employment record has, for 40 years, been unblemished. Jim's boss, Chief Probation Officer, Charles Winchester writes, "I have known Mr. Day for over 50 years. In the last 40 years he has been my Assistant Chief Probation [officer] in the Woburn District Court. As a probation officer, he has lived the legacy of John Augustus, 'Pioneer in Probation.' I have observed him educating, counseling and advocating for 'the poor victims of the law', in the true spirit of John Augustus."

There are 55 such letters of testimony from people from all walks of life who have been touched by the defendant's generous spirit. Moreover, many letters from people who

have known the defendant for many years attest to the aberrational nature of Jim Day's position as a defendant in a crime.

James has spent 30 years in other community service as described at PSR ¶61 and attested to in the many other appended letters. Needless to say, James has never had a run-in with the law in his entire 67 years of life. But for the instant offense, James has led an exemplary life in the service of others.

As for his mental and emotion condition, it is noted in the Presentence Report at ¶64 that James has suffered for many years with depression. The embarrassment and shame that resulted from his offense caused him to come close to suicide. He wisely checked himself into McLean's Hospital and was discharged with a diagnosis of Major Depressive Disorder. The defendant has followed up with weekly therapy and medication. Although he feels better and currently does not consider suicide, he is still very depressed and often becomes tearful when talking about his offense.

The defendant's remorse and shame cannot be adequately expressed. He lost his job, his reputation, and lost his pension. He hopes not to lose the respect of his family as well.

By all measures, James Day's behavior in the instant offense was aberrational and is deserving of a downward departure.

### Post-Booker Considerations

It is now settled law pursuant to *United States v Booker,* 125 S.Ct. 738 (2005), that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements. *Booker* requires that in addition to considering the final advisory guideline calculation, the sentencing court is mandated to consider the statutory

sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant.

The Presentence Report fairly describes the offense. The defendant does not dispute the fact that he lied to the Board of Appeals in order help Sharon Brennan get her driver's license back. The Presentence Report also fairly describes the defendant's background and family history. It is noteworthy that he has never had a blemish on his 67 years on this earth, prior to the instant offense. The letters appended to this memorandum speak volumes about the defendant and the respect he has garnered by all who really know him.

### Meeting the Purposes of this Sentence

As James Day stands now before the Court, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Noteworthy is the manner in which the Sentencing Commission incorporated the purposes of (A), (B), and (C) into the Guidelines:

> The Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. §3553(a)(2).) A defendant's record of past criminal conduct is directly relevant to those purposes [§ 3553(a)]. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and

10

future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. *USSG Ch.4,Pt.A, intro.comment.*

The Commission acknowledged that it had made no definitive judgment as to the reliability of then existing data and promised to review additional data insofar as they became available. *id intro.comment.*

To that end, the Commission conducted a study released in May 2004: <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines.</u>[2] "Using data collected from the guideline federal offenders sentenced in fiscal year 1992, the current study examines in detail the predictive statistical power of the criminal history measure..." *Recidivism study pg 2.*

Among other issues, the report concludes that offenders in CHC I have a substantially lower risk of recidivating within two years (13.8%) than do offenders in CHC VI (55.2%). *Id* pg 6. In general, as the number of criminal history points increase, the risk of recidivating within two years increases. *Id* pg 8. James Day has zero criminal history points that places him CHC I.

Another gauge to consider is the fact that recidivism rates decline relatively consistently as age increases. Among all offenders under age 21, the recidivism rate is 35.5%, while offenders over age 50 have a recidivism rate of 9.5% *Id* pg.12. Other factors that bode well for the defendant's very low risk to recidivate are listed in the study at pg 12 and include Employment Status, and Marital Status, and absence of illicit drug use. Data show that those with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%).

---

[2]This study is available online at the Commission's website, www.ussc.gov/publications/research.

11

James Day has always worked up to the day he was arrested on the instant offense.

Offenders who have never been married are most likely to recidivate (32.3.%). James Day has always been a fully engaged family man from the time his children were young. Although his children are now grown and live on their own, he maintains good relations with them. His wife is a constant source of support for him.

Yet another predictor of re-offending is illicit drug use. "Overall, offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0% than those not using illicit drugs (17.4%)." *Id* pg 13. Clearly, Jim has never had a drug problem. (*PSR ¶69*)

Another study which is even more relevant to James Day is the follow-up recidivism study Release 2 May 2004: <u>Recidivism and the "First Offender"</u>[3] This study recognizes that:

> The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment. Congress itself in the Sentencing Reform Act of 1984, promotes the first offender philosophy, citing the relevance of reduced sentencing levels for first offenders under the federal sentencing guidelines. [note 1, citing 28 U.S.C. §994(j).] *id* pg 1.

The Commission recognized that there was a difference between defendants in CHC I and a "true" first offender – the latter describing offenders whose instant offense is their first contact with the criminal justice system. The Commission established a working group in 1990 and again in 2000. A former Commissioner, Michael O'Neill suggested that a first offender (those without any prior convictions) provision could be incorporated into the guidelines either as a new first offender CHC or as a guided

---

[3] Id.

downward departure. The article ended by recognizing the limitations of a first offender analysis without the empirical advantage of recidivism data. *First Offender* pgs 3-4. Thus the Commission published the necessary data in the First Offender study.

Without attempting to repeat the findings of the study here, the important and relevant points to James Day are summarized. The study created three Groups within the category of "first offender." All within the three Groups have zero criminal history points: Group A, no arrests; Group B, no convictions; Group C, minor convictions only. *Id* pg 5.

Obviously, James Day fits as a Group A first offender. The Commission studied two-year recidivism rates and found that Group A has the lowest primary recidivism rate at 6.8 percent. *Id* pg 13-14. "From both culpability and recidivism perspectives, group A offenders with no prior arrest, most strongly meet the conceptual definition of the first offender category…they are easily the most empirically identifiable group of guideline federal offenders who are least likely to re-offend." *Id* pg 17.

In reviewing James Day's Presentence Report, it is remarkable that he has at least five indicators that make him very unlikely to recidivate. Indicators further support the proposition that there is no need to protect the public from further crimes of the defendant, nor does he need to be incarcerated as a deterrent.

Finally, the Court is mandated by 18 U.S.C. §3553(a)(6) to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. While the defendant does not have exact data on others in his same category it is also noteworthy that the Sentencing Commission has provided some data on "USE OF GUIDELINES AND SPECIFIC OFFENSE

CHARACTERISTICS" for fiscal year 2003. Perusal of the data indicates that most cases that apply §2C1.7 also include an enhancement for amount of loss (or the amount of the gratuity or bribe. Note that the instant offense provides no evidence that defendant Day received any money for the illegal favor granted to Ms. Brennan). There appears to be some correlation between the amount of the "loss" and the eight-level enhancement. When the "loss" level is between $2000 and $200,000, there is no enhancement for "high-level, decision-making position." However, when the "loss" level goes beyond $200,000, then the eight-level enhancement applies until the "loss" level is so high as to trump the enhancement. (The eight-level enhancement and "loss" level are applied by using the greater level. The enhancements are not cumulative.) *See* Attached Tables.

The same data for the guideline at §2C1.1 has similar results.[4] It is noted that §2C1.1 in the 2003 manual represents a more serious crime than that committed by the defendant. Nonetheless, there appears to be a correlation between the Value of the Payment used to influence the official and the employment of the enhancement, i.e., the greater the payment, the more likely the enhancement would apply.

Significantly, there is no loss attendant to the defendant's offense. He is among the least culpable for this type of offense whether the definition for the 2003 or 2004 manual is employed. These data also provide further support for not including the "high-level, sensitive position" enhancement in the guideline calculation.

Clearly, Day's offense is a serious one that deserves a sentence that provides some form of punishment. A just punishment, however, need not include incarceration. The defendant is being punished in many other tangible ways as a result of

---

[4] §2C1.1 was amended in the 2004 manual to increase the base offense level to 14 and decrease the "high-level, sensitive position" enhancement to 4 levels. The data presented here represent pre-2004 amendments.

14

his offense. He has, of course, lost the good will and respect that he spent 40 years building. Since his arrest on the offense, he had been living on a pension from the court system that he worked 40 years to earn. That pension has taken away from him in November 2005 and it is unlikely it will be restored. Furthermore, as a state employee, he is ineligible for social security. He is for all practical purposes, left penniless from his offense at a time of life when his earning capacity is diminishing. While his wife earns some money as a part-time nurse, the fact is that the financial future for them is dim. The defendant submits that a term of probation with a condition of Home Detention is sufficient punishment to meet the ends the justice of this case.

      Whether the Court arrives at a guideline range that does not include jail, or relies on an aberrant behavior guideline departure, or decides that given all the Sentencing Commission work and data, a sentence of Probation with Home Detention is sufficient but not greater than necessary to meet the purposes of sentences.

                                    Respectfully submitted:

                                    */s/ Joseph S. Oteri*
                                    Joseph S. Oteri
                                    Oteri & Lawson, P.C.
                                    20 Park Plaza, Suite 905
                                    Boston, MA  02116
                                    617-227-3700

Date: February 1, 2006

**CERTIFICATE OF SERVICE**

I, Joseph S. Oteri, hereby certify that this document was filed through the CM/ECF system which sends an electronic copy to the registered participants as identified on the Notice of Electronic Filing (NEF) and one paper copy will be sent to The Honorable William G. Young via hand-delivery, this 1st day of February, 2006.


*/s/ Joseph S. Oteri*

## USE OF GUIDELINES AND SPECIFIC OFFENSE CHARACTERISTICS
### Fiscal Year 2003

| Guideline and SOC | Applied | Percent |
|---|---|---|
| **Part C – Offenses Involving Public Officials** | | |
| §2C1.1 Offering, Giving, Soliciting, or Receiving a Bribe | 193 | 0.3 |
| (b)(1) Offense involved more than one bribe or extortion (2 levels) | 128 | 66.3 |
| (b)(2)(A) Value of payment or loss between $2,000 and $5,000 (one level) | 18 | 9.3 |
| (b)(2)(A) Value of payment or loss between $5,000 and $10,000 (2 levels) | 25 | 13.0 |
| (b)(2)(A) Value of payment or loss between $10,000 and $20,000[23] (3 levels) | 10 | 5.2 |
| (b)(2)(A) Value of payment or loss between $10,000 and $30,000 (4 levels) | 15 | 7.8 |
| (b)(2)(A) Value of payment or loss between $20,000 and $40,000[23] (4 levels) | 2 | 1.0 |
| (b)(2)(A) Value of payment or loss between $40,000 and $70,000[23] (5 levels) | 7 | 3.6 |
| (b)(2)(A) Value of payment or loss between $30,000 and $70,000 (6 levels) | 5 | 2.6 |
| (b)(2)(A) Value of payment or loss between $70,000 and $120,000[23] (6 levels) | 10 | 5.2 |
| (b)(2)(A) Value of payment or loss between $120,000 and $200,000[23] (7 levels) | 2 | 1.0 |
| (b)(2)(A) Value of payment or loss between $70,000 and $120,000 or (b)(2)(B) payment used to influence elected official (8 levels) | 21 | 10.9 |
| (b)(2)(A) Value of payment or loss between $200,000 and $350,000[23] or (b)(2)(B) payment used to influence elected official (8 levels) | 14 | 7.2 |
| (b)(2)(A) Value of payment or loss between $350,000 and $500,000[23] (9 levels) | 2 | 1.0 |
| (b)(2)(A) Value of payment or loss between $120,000 and $200,000 (10 levels) | 6 | 3.1 |
| (b)(2)(A) Value of payment or loss between $800,000 and $1,500,000[23] (11 levels) | 5 | 2.6 |
| (b)(2)(A) Value of payment or loss between $200,000 and $400,000 (12 levels) | 0 | 0.0 |
| (b)(2)(A) Value of payment or loss between $1,500,000 and $2,500,000[23] (12 levels) | 2 | 1.0 |
| (b)(2)(A) Value of payment or loss between $10,000,000 and $20,000,000[23] (15 levels) | 1 | 0.5 |
| (b)(2)(A) Value of payment or loss between $1,000,000 and $2,500,000 (16 levels) | 1 | 0.5 |
| (b)(2)(A) Value of payment or loss between $2,500,000 and $7,000,000 (18 levels) | 1 | 0.5 |

---

[23] Threshold amounts and level increases were changed on November 1, 2001.

## USE OF GUIDELINES AND SPECIFIC OFFENSE CHARACTERISTICS
### Fiscal Year 2003

| Guideline and SOC | Applied | Percent |
|---|---|---|
| §2C1.7 Fraud Involving Deprivation of the Intangible Right to the Honest Services Public Officials | 32 | 0.0 |
| (b)(1)(A) Loss between $2,000 and $5,000 (one level) | 1 | 3.1 |
| (b)(1)(A) Loss between $5,000 and $10,000 (2 levels) | 0 | 0.0 |
| (b)(1)(A) Loss between $10,000 and $20,000[23] (3 levels) | 2 | 6.2 |
| (b)(1)(A) Loss between $10,000 and $30,000 (4 levels) | 3 | 9.4 |
| (b)(1)(A) Loss between $20,000 and $40,000[23] (4 levels) | 1 | 3.1 |
| (b)(1)(A) Loss $30,000 and $70,000 (6 levels) | 1 | 3.1 |
| (b)(1)(A) Loss between $120,000 and $200,000[23] (7 levels) | 1 | 3.1 |
| (b)(1)(A) Loss between $200,000 and $350,000[23] or (b)(1)(B) involving an elected official (8 levels) | 7 | 21.9 |
| (b)(1)(A) Loss between $70,000 and $120,000 or (b)(1)(B) involving an elected official (8 levels) | 9 | 28.1 |
| (b)(1)(A) Loss between $350,000 and $500,000[23] (9 levels) | 2 | 6.2 |
| (b)(1)(A) Loss between $120,000 and $200,000 (10 levels) | 1 | 3.1 |



U.S. Department of Justice

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 12, 2006

Tricia Marcy
U.S. Probation Department
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Re:   United States v. James Day
      Cr. No. 05-10229-WGY

Dear Ms. Marcy:

The government submits the following comments and responses to the presentence report ("PSR") in the above-referenced case:

In ¶23, the PSR notes that the Guidelines Manual in effect was time of the offense was November, 2003 Guidelines, which has a more favorable base offense level for the defendant under §2C1.7 than the current guidelines. i.e., 10 vs. 14. Although the plea agreement was silent on this point, the parties used the current book, which, as you know, was amended in November, 2003 to eliminate §2C1.7 and raise the base offense level to 14 for §2C1.1. Under the plea agreement, the parties, however, took the position that the specific offense characteristic in §2C1.1(b)(3) ['the offense involved a high-level decision making or sensitive position"] did not apply.

The definition of that term contained in Application Note 4 to §2C1.1 seems to support the parties' position. It requires the defendant to have "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."   To the extent of the government's knowledge, the defendant's position as Assistant Chief Probation Officer for the Woburn District Court would not meet this definition.

January 10, 2006
Page 2

      It should be noted that the definition contained in §2C1.1 differs in a small but possibly significant way from the definition contained in §2C1.7. In the latter, the term is said to "include . . . supervisory law enforcement officers." This reference was deleted in the newer §2C1.1 version. As such, the defendant's supervisory position alone would not seem to qualify him for this enhancement under the newer version of the guideline. *Cf. United States v. Mack*, 159 F.3d 208, 219 (6th Cir. 1998)(noting the enhancement applied under §2C1.7(b)(1)(B) because the defendant was a "supervisory law enforcement officer.").[1]

      The significance of this distinction is that, even though the base offense level is higher in the later guidelines, the defendant would benefit from its more narrow definition of a "high-level decision making or sensitive position," than in the November, 2003 guidelines.

      Consistent with the plea agreement, the government takes the position that no specific offense characteristic is applicable.

                                       Very truly yours,

                                       MICHAEL J. SULLIVAN
                                       United States Attorney

                     By:                  
                                       S. Theodore Merritt
                                       Assistant U.S. Attorney

cc: Joseph Oteri, Esq.

---

[1] There is some ambiguity in Application Note 4 to §2C1.1 because while subsection (A) states a unitary definition for a "high-level decision-making or sensitive position," subsection (B) gives separate examples of "high-level decision-making" and "sensitive" positions. The latter includes "a law enforcement officer." Whether a probation officer in the Commonwealth of Massachusetts is considered a "law enforcement officer" is open to question. It is known, however, that probation officers are not in the same pension system as police officers.